LINDA MAYER, administratrix, *vs.* MEDICAL MALPRACTICE
JOINT UNDERWRITING ASSOCIATION OF MASSACHUSETTS.

No. 94-P-609.

Suffolk. November 2, 1995. - April 5, 1996.

Present: BROWN, KASS, & PORADA, JJ.

*Massachusetts Medical Professional Insurance Association. Insurance,*
Construction of policy, Medical malpractice insurance, Interest. *Interest.*
*Negligence,* Medical malpractice.

The terms "loss" and "damages" found in a policy of insurance written by
the Medical Malpractice Joint Underwriting Association (JUA) were
not ambiguous, nor did the policy's silence with respect to prejudgment
interest create an ambiguity, with the result that, under the terms of the
policy, JUA was legally obligated to pay as damages prejudgment inter-
est up to policy limits which its insureds were legally obligated to pay as
a result of a judgment against them [269-271]; further prejudgment
interest could not reasonably be considered a "cost" under the policy's
supplementary payments schedule, thus the JUA would not be obligated
to pay such interest beyond the policy limits [271].
Nothing in G. L. 229, § 11, and G. L. 175, § 112, establishes liability of
an insurer for prejudgment interest in excess of its policy limits.
[271-273]
There was no merit to a claim in a civil action that an assignment of a right
of action was ineffective. [273]
Summary judgment was correctly ordered in favor of an insurer on a claim
that the insurer was negligent in failing to settle a certain medical mal-
practice claim against its insureds where the insurer's action was reason-
able in light of information provided by its attorneys and expert wit-
nesses. [273-274]

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 4, 1993.

The case was heard by *Charles F. Barrett,* J., on a motion
for summary judgment.

*Ned C. Lofton* for the plaintiff.

*Tamara S. Wolfson* for the defendant.

BROWN, J. The plaintiff, Linda Mayer, appeals from the

entry of summary judgment in favor of the defendant, the Medical Malpractice Joint Underwriting Association (JUA),[1] on all four counts contained in her complaint. At issue is whether the JUA, under the terms of its policy, is required to pay prejudgment interest to the extent that it exceeds policy limits. Also at issue is whether the JUA's refusal to settle the underlying suit provides a sufficient basis for a claim of negligence or breach of the implied covenant of good faith, thus precluding summary judgment.

This case arose from the tragic death of a twenty-seven month old infant and the subsequent medical malpractice suit (the underlying suit) filed against two physicians, Drs. Berlin and Rubin (the "insureds"). On March 23, 1992, Mayer obtained a judgment in the underlying suit against the insureds, jointly and severally, in the amount of $2,000,000, plus $1,091,000 in prejudgment interest. Following the judgment, the insureds filed several posttrial motions. In addition, a dispute ensued concerning whether the JUA, under the terms of its policy, is required to pay the prejudgment interest. The JUA maintained that since the policies combined contained a $2,000,000 limit,[2] it is not obligated to pay prejudgment interest in excess of policy limits.

On April 9, 1992, Mayer, in a document entitled "Settlement Agreement and Release," agreed to dismiss and release all her claims against the doctors in exchange for payment by the JUA of the $2,000,000 verdict, plus all postjudgment interest. Pursuant to this agreement, the insureds agreed to withdraw their posttrial motions and to assign "all of their rights under their respective policies, and/or which they may otherwise have against the [JUA] arising out of the [u]nderlying" suit. The only right expressly mentioned in the agreement was the right for Mayer to litigate whether the JUA is obligated to pay the $1,091,000 in prejudgment interest. Four days later, the insureds assigned what rights they had against the JUA to Mayer in exchange for Mayer's release (signed April 9, 1992) of all claims against them.

On January 4, 1993, Mayer brought the present action against the JUA in the Superior Court. In Count I of the

---

[1]In May, 1993, the association changed its name to the Massachusetts Medical Professional Insurance Association. *Poznik* v. *Massachusetts Med. Professional Ins. Assn.*, 417 Mass. 48, 49 n.3 (1994).

[2]The insureds, Drs. Berlin and Rubin, each had a $1,000,000 policy with the JUA. For simplicity we refer to the two policies collectively.

complaint, Mayer sought a declaratory judgment that the JUA is liable to pay the $1,091,000 in prejudgment interest despite its policy limits. In Count II, Mayer sought to reach and apply any obligation on the part of the JUA to pay the prejudgment interest. In Counts III and IV, respectively, Mayer alleged that the JUA's failure to settle the underlying suit constituted (1) negligence and (2) a breach of the implied covenant of good faith and fair dealing.

The JUA successfully moved for summary judgment on all counts. With respect to Counts I and II, the motion judge was of opinion that the JUA policy was clear and unambiguous and determined that the JUA, under the terms of the policy, is not obligated to pay prejudgment interest to the extent that it exceeds policy limits. The motion judge did not consider the merits of Counts III and IV because he concluded that since Mayer had released the insureds of liability prior to the assignments, the insureds had no claims to assign.

Upon review of the record, it appears the summary judgment was warranted on all counts. We disagree, however, with the motion judge's reason for granting summary judgment with respect to Counts III and IV and uphold summary judgment on alternate grounds.

1. *Interpretation of the JUA policy.*

Mayer argues that as matter of law the JUA, under the terms of its policy, is obligated to pay prejudgment interest to the extent that it exceeds policy limits. Specifically, Mayer claims the following: (a) that the JUA policy is ambiguous with respect to coverage of prejudgment interest and that therefore this ambiguity must be resolved against the JUA; (b) that the term "damages" in the JUA policy does not include prejudgment interest; (c) that since a reasonable insured would conclude that prejudgment interest is a "cost" covered under the policy's "Supplementary Payments" section, the JUA is obligated to pay prejudgment interest despite policy limits[3]; and (d) that the JUA should be held liable "in

---

[3]The "Supplementary Payments" section provides, in pertinent part, that "the [JUA] will pay, in addition to the applicable limits of liability . . ., all expenses incurred by the company, all costs taxed against the insured in any suit defended by the [JUA] *and* all interest on the entire amount of any judgment therein which accrues after entry of the judgment . . . ." (emphasis supplied).

solido" with the insureds for death of the infant, and thus liable for prejudgment interest.

In interpreting insurance policies, "[w]e must construe the words of the policy according to 'the fair meaning of the language used, as applied to the subject matter . . .' " (citation omitted). *Johnson* v. *Hanover Ins., Co.*, 400 Mass. 259, 266 (1987). Moreover, "[w]hen the provisions of a policy are plainly and definitively expressed, the policy must be enforced in accordance with the terms." *Somerset Sav. Bank* v. *Chicago Title Ins. Co.*, 420 Mass. 422, 427 (1995). In light of these well settled principles of interpretation, we examine Mayer's contentions.

First, we consider Mayer's claim that the JUA policy is ambiguous. "[A]mbiguity exists in an insurance contract when the language contained therein is susceptible of more than one meaning." *Lumbermens Mut. Cas. Co.* v. *Offices Unlimited, Inc.*, 419 Mass. 462, 466 (1995). However, "ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." *Ibid.*

To support her claim of ambiguity, Mayer first asserts that it is unclear whether the term "loss," contained in the "Limits of Liability" section, refers to "loss to the insured, or . . . loss to the injured victim." Second, Mayer argues that the terms "damages" and "loss" are ambiguous in that it is unclear whether each has a distinct meaning. Mayer's reasoning, however, is somewhat difficult to follow, and her reliance on the aforementioned policy language appears to represent a strained attempt to create ambiguity where none exists. In any event, we do not discern the ambiguity that Mayer contends is present in the above mentioned language.

Nor do we find that the JUA policy's silence with respect to prejudgment interest creates ambiguity. The JUA policy, in pertinent part, provides:

> "The [JUA] will pay on behalf of the insured *all sums which the insured shall be legally obligated to pay as damages* because of . . . [i]njury arising out of the rendering of or failure to render, during the policy period, professional services by the individual insured, or by any person for whose acts or omissions such insured is legally responsible . . ." (emphasis supplied).

In *Factory Mut. Liab. Ins. Co.* v. *Cooper*, 106 R.I. 632, 637 (1970), the Supreme Court of Rhode Island, confronted with similar policy language, ruled the language unambiguous and held that the term "damages" included prejudgment interest. In *Cooper*, as here, the issue was whether the insurer was obligated to pay statutorily mandated prejudgment interest in addition to the judgment even though the total exceeded its policy limits. In finding lack of obligation, the court reasoned as follows:

> "What does the policy mean by the word 'damages' as used in its clauses? It is clear from the provisions of Part I that the insurance company promises to pay on behalf of the insured, up to the policy limits, only *"all sums* which the *insured* shall become legally obligated to pay as *damages.* (Italics supplied.) What 'sums' did the insured become legally obligated to pay as 'damages' within the language of this clause? The insureds became legally obligated to pay the total amount of all the verdicts returned by the jury against them. In addition, [by statute], they became legally obligated to pay interest thereon from the date of the commencement of the action. This prejudgment interest is thus included in the judgments. Therefore, these judgments represent the sums which the insureds were 'legally obligated to pay as damages'. . . ."

The court's reasoning in *Cooper* is equally applicable to this case. Under the terms of its policy, the JUA agreed to cover "all sums which the insured shall become legally obligated to pay as damages." Following a jury trial, judgment in the amount of $2,000,000 was entered in favor of Mayer against the insureds, Drs. Berlin and Rubin. Pursuant to G. L. c. 229, § 11, $1,091,000 in prejudgment interest was added to the judgment. Consequently, the $1,091,000 in prejudgment interest is a sum that the insureds became legally obligated to pay as damages. Although the policy does not expressly mention prejudgment interest, that silence does not create ambiguity.

Contending that the motion judge erred in ruling that the term "damages" in the JUA policy includes prejudgment

interest, Mayer further argues that the motion judge erroneously relied on *Turcotte* v. *DeWitt*, 333 Mass. 389, 392 (1955), in which the Supreme Judicial Court held that damages include prejudgment interest.[4] *Turcotte* is distinguishable, Mayer argues, because that case did not involve the interpretation of an insurance policy. This, however, is a distinction without a significant difference. Although *Turcotte* did not involve the interpretation of an insurance policy, its subsidiary holding — that damages include prejudgment interest — is nonetheless valid and provides support for the entry of summary judgment in favor of the defendant here.

Mayer next argues that since a reasonable insured would conclude that prejudgment interest is a "cost" covered under the JUA policy's "Supplementary Payments" section, the JUA is obligated to pay prejudgment interest despite its policy limits.[5] Examining the policy language as a whole, see *Bond Bros.* v. *Robinson*, 393 Mass. 546, 549 (1984), we think that it would be unreasonable for an insured to conclude that the term "costs," as contained in the "Supplementary Payments" section, refers to prejudgment interest. The "Supplementary Payments" section clearly differentiates between "costs" and "interest." See note 3, *supra* ("all costs taxed against the insured . . . and all interest on the entire amount of any judgment therein . . ."). If, as Mayer contends, "costs" include interest, the reference to postjudgment interest would be unnecessary. Mayer's argument is therefore without merit.[6]

In a final effort to establish that the JUA is liable for

---

[4]Mayer also asserts that the motion judge erred in relying on *Militello* v. *Ann & Grace, Inc.*, 411 Mass. 22 (1991), where the court, citing *Turcotte*, ruled that "[s]ince 'damages' include 'both the original debt or damage and whatever interest ought to be added to make a just verdict . . .,' an award of prejudgment interest is a substantive remedy." *Id.* at 26 n.4. The motion judge did not refer to the *Militello* case in his memorandum. However, to have done so would not have been erroneous.

[5]In support of this contention, Mayer relies on three out-of-State cases, all of which are distinguishable. *Cox* v. *Peerless Ins. Co.*, 774 F. Supp. 83, 86 (D. Conn. 1991) (policy interpreted with an eye toward furthering particular statutory objective). *State Farm Mut. Auto. Ins. Co.* v. *Crane*, 217 Cal. App. 3d 1127, 1131-1134 (1990) (policy provided coverage for interest on alldamages owed by the insured as a result of the judgment). *Lowe* v. *Tarble*, 313 N.C. 460, 464 (1985) (statute provided that prejudgment interest "shall be computed by the clerk and added to the costs of the party entitled thereto").

[6]Furthermore, Mayer urges this court to apply the "doctrine of reasonable expectations" and therefore to hold that, since the insureds believed

prejudgment interest in excess of its policy limits, Mayer argues that the combined effect of G. L. c. 229, § 11, and G. L. c. 175, § 112, is to hold the JUA liable "in solido" with the insureds for the death of the infant and thus liable for prejudgment interest despite policy limits. Mayer's argument, however, is based on the incorrect premise that G. L. c. 175, § 112, as amended following its original enactment, "moves the point of an insurance company's 'liability' backward in time from the moment of a judgment . . . to the moment of injury to the victim." This argument is likewise unavailing, as the statute does not have that effect.

In *Lorando* v. *Gethro*, 228 Mass. 181, 187 (1917), the court discussed the primary purpose of St. 1914, c. 464, § 1, the progenitor of G. L. c. 175, § 112:

> "The instant statute has for its chief object simply a regulation as to the form of a policy of insurance. It prohibits in substance the insertion in any contract for casualty insurance of a condition that the insured must actually pay the loss before liability attaches to the insurer. With that single exception and its accompanying incidents the insurer and the insured are free to make such contracts as they choose, and the scope and validity of such contracts are left as before, unaffected by this statute."

A further purpose of the statute, as originally enacted and as amended, is "to give to the person injured by the conduct, against loss from which the assured is insured by his policy of insurance, a certain beneficial interest in the proceeds of that policy. It does not enlarge nor modify in any respect the substantial liability created by the contract of insurance." *Id.* at 187. *Bruyette* v. *Sandini*, 291 Mass. 373, 377 (1935). Under the statute (both as originally enacted and as amended), the

---

that the prejudgment interest would be covered, the JUA is obligated to pay. This doctrine, however, does not appear to have been adopted by the Massachusetts courts. See *Bond Bros.* v. *Robinson*, 393 Mass. at 551; *Jefferson Ins. Co.* v. *Holyoke*, 23 Mass. App. Ct. 472, 476-477 (1987). Nevertheless, "[a]ssuming that [the doctrine] applies, even in the absence of ambiguity, . . . it is clear that the standard it imposes is an objective one." *Mitcheson* v. *Izdepski*, 32 Mass. App. Ct. 903, 906 (1992). Here, it cannot be said that the insureds had a reasonable expectation of coverage beyond the express policy limits.

"loss or damage" is established only "when the damages resulting from that casualty have been fixed in [some] legal way." *Lorando* v. *Gethro, supra. Mathewson* v. *Colpitts,* 284 Mass. 581, 585 (1933). Thus, the statute as originally enacted and as amended, "merely enables the person suffering the initial damages, out of which grows the loss to the insured, to acquire a lien against the loss and the right to damages or indemnity arising under the policy and to enforce it in its own name." *Lorando* v. *Gethro, supra. Bruyette* v. *Sandini,* 291 Mass. at 377.

In sum, we conclude that the JUA policy is unambiguous. "As we read no ambiguity in the policy, there is no occasion to invoke . . . the doctrine that ambiguities in an insurance policy are to be resolved against the author of the policy." *Chisholm* v. *Commonwealth Mort. Co.,* 37 Mass. App. Ct. 925, 926 (1994). We accordingly conclude that the JUA is not obligated to pay prejudgment interest to the extent that the prejudgment interest, when added to the judgment, exceeds policy limits. The allowance of summary judgment in favor of the JUA on Counts I and II was proper.

2. *Validity of the assignments.*

Mayer argues that the judge's conclusion that, since the insureds were released of liability four days prior to the assignment by the insureds to Mayer of their rights against the JUA, the claims under Counts III (negligence) and IV (breach of implied covenant of good faith and fair dealing) were extinguished[7] is incorrect, because, prior to the signing of the release, the plaintiff and JUA had signed an agreement obligating the insureds to execute the assignment and obligating the plaintiff to execute the release.

Passing the question whether the assignments were ineffective, we think that summary judgment was nonetheless warranted because the undisputed facts show that the JUA was not in breach of any duty of care owed to the insureds. Mayer asserts that the JUA was negligent in failing to settle the underlying claim. In order to establish negligence on the part of an insurer with respect to settlement of claims, an insured

---

[7]In support of his conclusion, the motion judge cited *Clement* v. *Prudential Property & Cas. Ins. Co.,* 790 F.2d 1545 (11th Cir. 1986), which held that under Florida law when an injured third party releases the insured of liability, any bad faith claim against the insurer is extinguished because the insured is no longer exposed to excess liability.

must demonstrate that "the plaintiff in the underlying action would have settled the claim within the policy limits and that, assuming the insurer's unlimited exposure (that is, viewing the question from the point of view of the insured), no reasonable insurer would have refused the settlement offer or would have refused to respond to the offer." *Hartford Cas. Ins. Co.* v. *New Hampshire Ins. Co.*, 417 Mass. 115, 121 (1994).[8] The latter requirement is fatal to Mayer's claim.

Contrary to Mayer's contention, it cannot be shown that no reasonable insurer would have refused to settle the underlying claim. The JUA's decision not to settle was reasonably based on the information and advice it received prior to trial. Defense counsel had repeatedly advised the JUA that if the case were to go to trial there was at least a fifty percent chance that the insureds would prevail. Moreover, this advice by defense counsel was grounded in the opinions of three medical experts, all of whom concluded that the insureds had acted in accordance with acceptable medical practices.[9] See *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 677 (1983) (summary judgment was warranted because insurer had received independent advice from expert witnesses indicating that liability was not reasonably clear). In addition, defense counsel advised the JUA that even in the event that Mayer prevailed, the verdict would most likely be in the range of $300,000 to $400,000, an amount well within the policy limits. Based on this information and advice, it cannot be said that no reasonable insurer would have failed to settle. Therefore, the JUA is entitled to summary judgment as matter of law.[10]

*Judgment affirmed.*

---

[8]The court made it clear that "the test is not whether a reasonable insurer might have settled the case within the policy limits, but rather whether no reasonable insurer would have failed to settle the case within the policy limits." *Id.* at 121.

[9]Dr. William Kaiser, in a written report to the JUA, concluded that there was no "negligence or suboptimal care on the part of" the insureds. Dr. Cody Meissner opined that "Dr. Berlin performed in an entirely reasonable manner." Dr. Sydney S. Gellis concluded that there was "no evidence . . . of deviation from standards of medical care."

[10]Mayer argues that because the judgment in the underlying suit far exceeded policy limits this constitutes prima facie evidence of bad faith. This argument is without merit.